DOVIA McSWAIN, Plaintiff-Appellee, *v.* CHICAGO TRANSIT AUTHORITY, Defendant-Appellant.

First District (2nd Division)    No. 61226

Opinion filed February 25, 1977.—Rehearing denied May 26, 1977.

DOWNING, P. J., dissenting.

Sal M. Bianchi, John J. O'Toole, and Michael A. Gerrard, all of Chicago, for appellant.

Sheldon Hodes, of Chicago (William J. Harte, Ltd., of counsel), for appellee.

Mr. JUSTICE JIGANTI delivered the opinion of the court:

This is an action by plaintiff, Dovia McSwain, for damages for personal injuries allegedly caused by the negligence of the defendant, Chicago Transit Authority (CTA), in the operation of one of its elevated trains on September 27, 1970. During the bench trial the defendant admitted liability and the trial court entered judgment in the amount of $150,000 for the plaintiff. The trial court found that plaintiff had multiple sclerosis and that there was a causal relationship between the multiple sclerosis and the accident of September 27, 1970. The CTA appeals, contending (1) that plaintiff has not established by a preponderance of the evidence that she has multiple sclerosis and (2) that plaintiff has not established by a preponderance of the evidence that there was a causal relationship between her injuries and the accident of September 27, 1970.

The legal propositions advanced by defendant are deceptively simple and unchallenged. Only two cases are cited; *Reivitz v. Chicago Rapid Transit Co.* (1927), 327 Ill. 207, 158 N.E. 380, for the proposition that the plaintiff has the burden of proving his case by a preponderance of the evidence, and *Daly v. Bant* (1970), 122 Ill. App. 2d 233, 258 N.E.2d 382, for the proposition that plaintiff must establish by a preponderance of the evidence a causal connection between the alleged negligence and the injury. Defendant also quotes the Illinois Pattern Jury Instructions, Civil, No. 21.01, stating that the test is whether one having the burden of proof has proved that his position is "more probably true than not true." The propriety of the application of the law to the facts in evidence is the only issue. Because of the technical nature of the evidence and the significance of the chronology of events, the evidence is set forth in great detail.

Before beginning the lengthy statement of facts, however, it is necessary that some introductory information regarding the disease of multiple sclerosis be set forth. Dr. Klawans, a board certified neurologist, and Dr. Cascino, a board certified neurosurgeon, provide, in their testimony in this case, detailed descriptions of multiple sclerosis, its nature, causes and symptoms. We have attempted to summarize their testimony and synthesize it in the following synopsis, with the testimony of the other medical experts who testified in this case.

Multiple sclerosis is a classic disease of the myelin. Myelin is the coating on the cells of the nervous system which insulates, nourishes and conducts impulses along the axons of the nervous system. The cause of multiple sclerosis is unknown but experts hypothesize that it is caused by a virus which is present in the body of a susceptible person prior to age 15 and which is activated, precipitated or exacerbated upon some triggering event such as trauma (especially injury to the neck), fever, excessive fatigue, infections, emotional distress or other factor.

Multiple sclerosis is characterized initially by inflammation or swelling of the myelin around the nerve endings resulting, in the later stages of the disease, in scarring of the myelin, which is destroyed and broken down, creating "multiple" lesions in the nervous system. "Multiple" also applies to the fact that patients have multiple attacks of the disease. At one point the disease may affect the patient's gait (inflammation stage). They can recover slowly (remission) and be able to walk with less difficulty (scarring stage). The next episode may involve inflammation of another area of the central nervous system which may, for example, affect the vision, producing diplopia, then improved vision, and then almost normal, but weakened, vision which will eventually deteriorate as the lesions become more numerous or more severe and the myelin is destroyed creating more scarring. Ultimately the damage can be irreversible and permanent.

The following are some of the classical symptoms of multiple sclerosis: ocular disturbances; nystagumus (involuntary oscillation of the eyeballs); diplopia (double vision); diminished eyesight; difficulty with speech; difficulty with performing with the extremities; weakness with seizures of spasticity; weakness in arms or hands such as inability to grip; ataxia (difficulty in walking characterized by stumbling, wobbling, falling); increased or abnormal reflexes; hyperflexia indicated by Babinski or other abnormal signs; intention tremor; clonus (extreme weakness in the legs); atrophy; paresthesia (numbness or other abnormal spontaneous sensation such as burning or pricking); loss of abdominal reflexes; urinary incontinence; bladder difficulties; rectal functions interfered with.

Multiple sclerosis is extremely difficult to diagnose partly because an involvement of any of these areas may last from weeks to months, then the patient enters a period of remission during which the symptomology abates, and after which the same symptoms or other symptoms recur and may be exacerbated. Multiple sclerosis is a debilitating disease in which, typically, the possibility of further disability in the future is very high. Patients who have attacks tend to have more attacks. There is presently no known cure for multiple sclerosis.

Because of the length of the factual situation, a prefatory comment is necessary. For the sake of clarity, we have attempted to present the facts in a more or less chronological order, therefore the testimony of the plaintiff is interspersed between the testimony of the medical experts.

Plaintiff testified that in 1965, she had received a whiplash injury due to an automobile accident but returned to school (licensed practical nurse's training) the next day. She experienced no discomfort; she received no other treatment except an Ace bandage. She experienced no symptoms similar to her present symptoms.

In June 1970, three months before the accident which is the subject of

the instant appeal, plaintiff was injured on her left side when the car which she was driving hit a pot hole and she was thrown into the door on the driver's side. She was treated by a doctor at a local medical center on just that one occasion. She recovered from all of the complaints that she sustained in that accident.

Prior to the CTA accident of September 27, 1970, from which this suit arises, plaintiff's health was very good and she had never experienced any of the symptoms complained of before that time. Prior to the CTA accident, plaintiff had been continuously employed as a licensed practical nurse. She earned approximately $4000 in 1969, and $5000 in 1970. Since breaking her wrist in 1971, she has been on public assistance.

In addition to the above testimony of plaintiff it was stipulated between the parties that at the time of trial, August, 1974, plaintiff was 41 years old and had a life expectancy of 36.4 years.

On September 27, 1970, about noon, an accident occurred at the Davis Street station when the elevated railway train in which plaintiff was a passenger was hit from the rear by another CTA train. The CTA, through one of its attorneys, admitted liability. Plaintiff, a licensed practical nurse, was riding backwards facing south and, at the time of impact, was thrown forward into the safety bar on the seat in front of her which struck her in the neck. She was immediately thrown backward again. Plaintiff testified that for a moment she could hardly breathe or talk but in a very short time it cleared up to the extent that she could speak in a whisper. Plaintiff was transported from the scene by an emergency vehicle which took her to St. Francis Hospital.

Upon arrival at the hospital plaintiff was taken to the emergency room where she spoke to an intern, Dr. Philip Cacioppo, a 1967 graduate of Loyola Medical School who served his residency in general surgery at St. Francis Hospital. She told Dr. Cacioppo that she had a lump in her throat; it was difficult to swallow; she had a gagging feeling; that in addition to the injury to her neck she had hit her chest and it felt very tight; that she was shaken up. Her medical history and Xrays were taken.

Dr. Cacioppo, when called by plaintiff, testified that he vaguely recalled the accident of September 27, 1970. He had treated a number of patients in the emergency room but had no independent recollection of plaintiff. The hospital records, which bear his name as resident, indicate that plaintiff was involved in an accident, had trauma or injury to the right front side of the neck from the mastoidal process (behind the ear) to the clavicle (below the shoulder). Although a severe blow to that region could impair speech, no loss of voice is recorded in the hospital record. Dr. Cacioppo said plaintiff suffered a soft tissue injury; he diagnosed muscular trauma with musculature strain. The Xrays showed loss of cervical lordosis, an objective finding which usually indicates that the patient is

moving his or her head in response to pain. Dr. Cacioppo prescribed medication for pain. He saw plaintiff in the emergency room.

Plaintiff testified that she remained in the emergency room for about eight hours. She was released from the hospital and was taken home by a friend. When she arrived home she noticed that her neck hurt and that she was bruised across the front part of her body. She stayed home from work and rested for two or three days after the accident at which time she noticed that she became dizzy when she would bend down to do routine household chores. She took the medication for pain prescribed by Dr. Cacioppo and tried to take it easy but the soreness, bruises, and aching became more pronounced so she called Dr. Frank M. Wittelle whose name she obtained from the local telephone directory. She went to his office about four days after the accident.

Dr. Wittelle has been a physician in private practice for about 30 years. He has taught and held clinics at the University of Illinois College of Medicine for about 16 years. Dr. Wittelle, who was called by the plaintiff, testified that he saw plaintiff for the first time on October 2, 1970, five days after the accident. He saw her again October 6, 13 and 15. He recommended that she be admitted to Jackson Park Hospital where he saw her every day from October 16 to October 24. He saw her again October 29 and finally in November, 1970.

Dr. Wittelle testified that his records contained a history of plaintiff taken at the first office visit on October 2, 1970, which indicated that she had been involved in an elevated railway train accident in which she was thrown forward and hit her face, shoulder, and arm on the seat in front of her. Plaintiff complained to him of severe headache, difficulty in swallowing, extreme nervousness and worry over her recovery and her ability to work as a licensed practical nurse, and pain from contusions on her right wrist, right shoulder, neck, and right side of her face. She experienced extreme pain on turning her head or flexing or extending the head on the neck. This indicated to Dr. Wittelle that there was damage to the nerves coming out between the cervical vertebrae and that she had what is commonly called a severe whiplash injury plus contusions of the shoulder, right arm, neck, and face. Dr. Wittelle prescribed pain medication as well as physiotherapy and heat. At first this was done at home, but, when it became apparent that she was getting worse instead of better, he suggested admission to the hospital because he was afraid of permanent injury; because the swelling of the right arm and shoulder did not go down quickly; because he wanted the plaintiff where he could keep her under controlled conditions to determine whether the medication was helping; and because he wanted to determine how severe and what the outcome of the injuries would be. It was his opinion that the accident was the "stimulating factor to her condition."

Plaintiff was admitted to Jackson Park Hospital for nine days on October 16, 1970. Dr. Wittelle testified that much of the hospital record was in his own handwriting including the admitting statement which said that plaintiff was admitted for study and treatment with severe traumatic radiculitis (involvement of the nerves coming out between the cervical vertebrae and joining up with the nerves over the shoulder on her right side). Pain was severe and constant and was only partially controlled by medication. Plaintiff complained of weakness on her right side. Movement both active and passive of the head and neck produced severe pain. He stated that movement against resistance aggravated the pain; muscle spasticity was 4 plus (the top degree of severity or intensity of pain). Movement of her right arm was restricted and painful. Radiculitis has been known, in many cases where the original injury was severe, to be a permanent condition. In Dr. Wittelle's judgment within a reasonable degree of medical certainty, plaintiff's injury was permanent. Strain or sprain may be very severe without showing in Xrays. Although plaintiff's Xrays showed no observable pathology, Xrays do not reveal damage to soft tissue. While in Jackson Park Hospital, plaintiff was given physical therapy and hot packs which made her feel better.

Plaintiff testified that, after her discharge from the hospital in late October, she felt better; accordingly, she asked Dr. Wittelle when she could return to work. As she began moving about the house more she still experienced some weakness, pain, poor balance and lightheadedness. After she had been home two or three days she fell in her apartment. She noticed that when she fell she could not get up immediately. As she fell she noticed that "her right leg went out."

After being at home one week she put herself on call with the nursing registry as a licensed practical nurse for the afternoon shift because it is a lighter shift than the 7 to 3 shift she usually worked. She remained on this shift about three weeks, until November 15, 1970, when she had a second fall in her living room when her right leg went out again. She noticed that she was weak, could not get up right away and that her arm was broken. She called a friend and went to Woodlawn Hospital where they took Xrays. They wanted her to remain overnight but she preferred Wesley Memorial Hospital, so she took a cab to Wesley where an intern put a cast on her right arm.

Dr. Andrew D. Bunta is an orthopedic surgeon who graduated from Northwestern Medical School and was a first-year resident at Wesley Memorial Hospital on November 15, 1970, when plaintiff came to that hospital with a broken right wrist. Dr. Bunta, in testifying for the defendant said that he had no independent recollection of plaintiff and that the records taken in the ordinary and usual course of business did not refresh his recollection as to his examination of plaintiff. He testified only

as to what is generally done in the emergency room. Part of his responsibility as a first-year resident was to take the new patient's history and examine the patient. Plaintiff's hospital record shows that she sustained a fractured right wrist as a result of a fall in her home. The history indicates that she said that she tripped on a rug in her home at 4:30 a.m. that day and fell forward onto her hand and wrist causing the injury. When he recorded plaintiff's history she had a long-arm cast on the right arm. Except for the broken wrist, the record noted no other abnormalities; no complaints, no prior significant medical history; no prior problems, hospitalizations or accidents.

Dr. Robert G. Thompson, the resident orthopedic surgeon at Wesley Memorial Hospital at that time, was called in to look at plaintiff's wrist. He testified for plaintiff that, although plaintiff's fracture was reduced under local anesthesia, subsequent Xrays showed further reduction was necessary, so plaintiff was admitted to the hospital November 15, 1970, and on November 16, under general anesthesia, the fracture was reduced satisfactorily and a transfixion pin was applied through the thumb. Plaintiff was discharged November 17. He saw her again on November 24, December 10, and December 22 when the pin and the long-arm cast were removed and a short-arm cast put on. On January 5, 1971, a half-cast was put on which could be removed daily for exercise and washing of the hand. On January 20, when motion, rotation and function were good and prognosis with respect to her wrist was good, Dr. Thompson discharged plaintiff as a patient.

Plaintiff testified that she did not see Dr. Wittelle while she was under care of Dr. Thompson for the fractured wrist, a period of about eight weeks. She stated that she did not review her history and complaints with Dr. Thompson, although she did tell Dr. Thompson that she could not wear the sling around her neck to support the long-arm cast because she could not take the pressure of the sling on her neck which was still damaged.

Plaintiff testified that she never returned to work after January of 1971. She stayed home because her neck was worse; she noticed pain in her right shoulder and arm; she noticed continued dizziness and that she stumbled a lot, which she had never done before; she also noticed weakness of her right side. She gave herself hot packs and took the prescribed medication. In June of 1971, nine months after the accident, she noticed a numbness on the right side of her face from the top of the head to the chin. She went to see an oral surgeon, Dr. Gantz, who referred plaintiff to Dr. Oscar J. Moore, Jr., whom she saw first on September 9, 1971. She complained to Dr. Moore of diplopia or double vision; that her neck hurt all the time; that her right arm and leg were weak; that she had radiating pain from her neck and shoulder on the right side; that she stumbled and fell a lot; and

that her eyes bothered her. She went to him because of a neuralgia on the right side of her face. He prescribed muscle relaxants and pain medication. He gave her a neurological examination. Plaintiff testified that she told him about pain in her arms, about her throat, about being lightheaded. She told Dr. Moore about dragging her foot which started about the time she was released from Jackson Park Hospital after the accident in about October, 1970.

The next time she saw Dr. Moore was in November of 1971, and then in January of 1972 when she went to see him about her cervical spine and her neck. At that time, as on each prior occasion, Dr. Moore did a complete neurological examination of her. She continued to see Dr. Moore until January 1974, on approximately a monthly or bimonthly basis. She told him of lightheadedness, dizziness, loss of balance and difficulty in swallowing. Dr. Moore conducted various tests, including many Xrays and a brain scan, and he prescribed medication.

Dr. Moore testified for plaintiff that he was licensed to practice medicine in Illinois in 1969. He began at Presbyterian & Rush Medical School and has been at Michael Reese and the University of Chicago practicing internal medicine since then, although when he came from Boston his specialty was cardiology. He has taught medicine for eight years, the last three years at the University of Chicago. Dr. Moore saw plaintiff a total of 18 times from September 1971 until about December 1973.

He stated that plaintiff first came to his office in September, 1971, concerned with symptoms that she thought she had developed from an accident she had had. Prior to the accident she had felt perfectly well. Her symptoms were primarily from the midchest up and primarily on the right side. She had weakness and numbness in her right arm, pain in her neck, decreased range of motion in her neck. She had sensory findings in her face (right side), and weakness in her right leg. He took her history and did complete medical and neurological examinations. He found paresthesia in the right jaw. At times her ability to sense was present and at times she exhibited numbness. He found a weakness in the right arm and in the right leg. She was having pain in her cervical spine and right shoulder and had a diminished ability to grip. In her lower right extremity there was no pain, it was just objectively weak. She wobbled which demonstrated a weakness in the right leg and made it difficult for her to walk. Her brain scan was normal. She had muscle spasms and pain in the cervical spine. He recommended decreased activity and thought she was in no position to continue to work. He gave her muscle relaxants and prescribed heat applications.

Dr. Moore found paresthesia and hyposthenia attributable to the trauma but also it was apparent that something more than trauma was

involved. It appeared that she had more than an acute injury. Plaintiff was under Dr. Moore's care until approximately December, 1973. In his medical opinion there is a causal relationship between the condition of ill-being he diagnosed and the accident. His diagnosis was, first, trauma, and, second neuropathy of unknown variety of etiology.

Dr. Moore on cross-examination was unable to find notations regarding several of the plaintiff's symptoms or complaints in the record which defendant offered in evidence since that record was incomplete. The record did indicate that on November 11, 1971, the neurological examination was negative and motor negative. He noted neuralgia concerned itself with the fifth trigeminal nerve, which could have been caused by trauma or independent process. The brain scan ruled out any space-occupying lesion such as brain tumor as the cause of plaintiff's complaint. There was an objective finding of mild cervical spasm. Although he testified to findings of lightheadedness, dizziness, loss of balance, a fall resulting in a broken arm and difficulty with right arm and leg, these findings were not in his records. He found no evidence of radiculitis; "She didn't get that close to the nerve roots."

The above symptomology of plaintiff was noted in a letter from Dr. Moore to the Department of Public Aid dated April 28, 1972. Dr. Moore also noted diplopia. Dr. Moore never found any etiology of the sensory problems or radiculitis. In response to a hypothetical question describing a case history substantially the same as plaintiff's, Dr. Moore testified that there was a causal relationship between the trauma of the accident of September 27, 1970, and the symptoms of plaintiff. She last saw Dr. Moore in February 1974.

During the time she was seeing Dr. Moore, plaintiff was involved in an automobile accident. On February 3, 1973, 28 months after the CTA accident, plaintiff's car was hit by another automobile. She was admitted to South Shore Hospital that evening with complaints of neck and back pain and numbness in her right arm. Plaintiff testified that after this accident the same complaints for which she had been being treated since the CTA accident returned and were aggravated.

The following morning, February 4, 1973, plaintiff was seen by Dr. William J. Marshall, whose specialty since graduating from Loyola Medical School in 1954 has been general surgery. Dr. Marshall testified for the defendant that when he saw plaintiff the first time, he took her history and examined her. He did not have any independent recollection of plaintiff and indicated he would need to refer to the hospital records since he sees so many emergency room patients. The records indicate that he examined her eyes and found no nystagmus (involuntary oscillation of the eyeballs). He tested motor strength by shaking hands with her. He tested her reflexes by stroking her foot (Babinski test). He found no neurological

pathology at that time. He testified that in no way did he give her the kind of neurological examination she might have been given by a neurologist. She had a very spastic, stiff neck which could have been causally related to the accident of the previous day. Her Xrays showed no fracture or pathology. The lordotic curve seemed normal. However, the resident in the emergency room thought she might have had an abnormality in the Xrays and put her in traction temporarily. Plaintiff complained of dizziness; problems with her right side, right arm and left leg; numbness in her right hand and on the right side of her face. Dr. Marshall did not know whether these problems were the result of the accident of February 3, 1973, or of the accident two or three years before. It was unusual that plaintiff should complain at one time of problems on her right side and another time of problems on her left side. This could be something of a neurologic nature. Numbness of which she complained would probably have no relationship to any nerve root irritation of the cervical region suffered as a result of the February accident but rather signals a possible neurological or vascular problem. Dizziness is a symptom which could be related to a neurologic disorder.

When he examined plaintiff he knew she had some neurological problem in addition to her neck problem since she had been under the care of a neurologist for two years. Dr. Marshall centered his treatment on the complaint with respect to her neck to determine whether she had a serious injury to the cervical spine. He diagnosed whiplash injury to the neck with nerve root involvement. She was treated for six days in the hospital and she made improvement with respect to her neck. She was sent to a physiotherapist as an outpatient and saw Dr. Marshall once after her release. He presumed she was going back to the neurologist.

Dr. Marshall found no evidence of multiple sclerosis. He testified that he is not a neurologist nor an orthopedist and has no special training in those areas. He does not treat multiple sclerosis patients. An internist or neurologist would diagnose and treat multiple sclerosis. He stated that multiple sclerosis is very difficult to diagnose. When he stated he saw no evidence of multiple sclerosis in plaintiff, the basis of his answer was that he saw no classical signs of multiple sclerosis such as bladder difficulty. Dr. Marshall's records show that he stated there were few findings to explain her symptoms except for spasm in the neck muscles and numbness in the right side of her face.

Plaintiff testified that after her release in February 1973 from South Shore Hospital plaintiff returned to and continued to see Dr. Moore. She saw him the last time in February 1974, when she was admitted to Michael Reese Hospital at the request of Dr. Harold Klawans.

Plaintiff testified that she went to see Dr. Harold Klawans in February 1974 at his office in Michael Reese Hospital and that his initial examination

of her was very thorough taking between 45 minutes to an hour. She was then admitted to the hospital for eleven days during which time many tests were run including a spinal or lumbar puncture. Dr. Klawans prescribed ACTH and Tylenol.

Plaintiff testified that she gave Dr. Klawans a detailed history when she saw him in February 1974. She told him she had suffered from lightheadedness for a long time, since about the time she was hurt in the CTA accident. She told him of her previous hospitalizations and complaints that existed at that time, February 1974. She did not recall telling him about the dizzy spells. She had difficulty with her gait at that time and since the time she got hurt about November of 1970.

Plaintiff said she was admitted to Michael Reese Hospital February 7, 1974, for 11 days at which time a history was taken by one of the doctors or residents at Michael Reese. She told them there had been no period of unconsciousness, no vomiting, no nausea, that she had periods of weakness in her right side and lower limbs which she first noticed when she fell in her apartment after the CTA accident. She thought she told him of the 1973 automobile accident and subsequent treatment for whiplash. She told them of dizziness which began after the CTA accident, of difficulty in swallowing, of double vision, of numbness in left thumb and index finger, about stumbling when she walked, weakness on the right side of her body, numbness in the upper left extremity, and giddiness. Plaintiff testified that they conducted many tests including Xrays, a brain scan, an electroencephalogram, and a lumbar puncture. Plaintiff was still under the care of Dr. Klawans at the time of the trial.

Dr. Klawans, who had never testified in court before, testified for plaintiff that he was graduated from the University of Illinois Medical School in 1962, interned at Presbyterian-St. Luke's Hospital and then completed a five-year residency in neurology. He is certified by the American Board of Neurology and Psychiatry, a member of the American Academy of Neurology, World Federation of Neurology and the International Society of Neurochemistry. He is the director of the Division of Neurology at Michael Reese Hospital and an associate professor of medicine at the University of Chicago. In the last six years he has written over 90 articles on peripheral injury; he has authored a book on pharmacology of certain nervous system diseases; edited a book entitled "Experimental Models of Human Neurological Disease"; and was currently in the process of editing 10 volumes of "The Handbook of Clinical Neurology", which is the third attempt to compile a definitive statement on neurology. He is the only American neurologist who has been asked to edit part of this 42-volume international project.

Dr. Klawans testified that he examined plaintiff on February 6, 1974, and took a detailed history and examined her previous medical records

including the records from St. Francis Hospital, Dr. Wittelle, Jackson Park Hospital, Dr. Thompson, Wesley Memorial Hospital and Dr. Oscar J. Moore, Jr. He also carried out a very detailed neurological examination.

On direct examination Dr. Klawans testified that plaintiff told him about the accident of September 27, 1970, in which she was injured and wherein she had a trauma delivered to her neck anteriorly and to her right shoulder which was diagnosed at that time as whiplash injury and radiculitis with a great deal of pain and discomfort involving her neck and right arm.

Her history indicated that she was initially treated and sent home from St. Francis Hospital and later admitted to Jackson Park Hospital and treated with heat, traction and a neck brace with some definite symptomatic improvement. She was able to return to work and carry on some activities using both hands shortly after discharge. She then related that she fell at home shortly thereafter. She felt that this was due to being woozy or having poor balance and she could not use her right arm to push herself up or for heavy work thereafter. Her right leg, she thought, was probably pretty good.

Dr. Klawans' records indicated that she fell again on November 15, 1970, on turning, and describes that she virtually flew across the room. She felt that her right arm buckled back and she broke her wrist and the right arm was extremely weak and she had very little movement. Since then she has had a variety of neurologic problems. At that time her right arm felt heavy, and she had an aching sensation especially in the right triceps area, posterior part of the right arm, and weakness of her right arm.

By June of the next year, 1971, she noticed that her leg dragged when she was tired. She also noted severe right facial numbness from her scalp to her jaw. This later improved. She also gave a history that she was falling frequently between late 1970 and the summer of 1971. She stumbled frequently. She felt she was better but still occasionally stumbled. She gave a history of double vision which would be present for a while and then go away for awhile. She also gave a history of having episodes of urinary incontinence that lasted for several days to a week and which appeared to improve when she was placed on sulfur medication.

Dr. Klawans stated that it should be noted it is very difficult to elicit a history of incontinence. It is often found in patients who are very embarrassed to discuss such things. There was also a history of subsequent neck injury, of a whiplash, in 1973 with some exacerbation of discomfort in her neck.

Dr. Klawans' neurological examination of plaintiff in 1974 revealed double vision on lateral gaze bilaterally. That means that, when looking at the object in the lateral field of gaze, it would appear double. This is

usually due to difficulty in coordinating the parallel movement of the eyes in one direction so that they both focus at the same place at the same time. If one does not move quite as far over, the patient sees double. She also had vertical nystagmus, that is the same kind of jerky irregular movements, but this is in a vertical plane. This was present on a lateral vision in either direction, was disconjugate, not the same in both eyes. It was greater in the abducting eye, the eye looking away from the body, than the adducting eye, the eye looking forward.

Disconjugate nystagmus is definitely a sign of a small injury within the very sensitive brain stem posterior to the head mechanisms that control eye movements, and it is evidence of a small myelin injury there, and it is extremely suggestive of multiple sclerosis in this age group, suggesting a lesion.

Her reflexes were active and were not symmetrical. They were greater on the right than the left, and she had an abnormal Hoffmann reflex on the right. The asymmetry of the reflexes is always abnormal, and this suggests a second lesion within the brain because the lesion that controls the eyes could not cause the reflex abnormality.

There was decreased sensation over her face, on one side suggestive of a third lesion, and she had mild gait ataxia or imbalance with inability to stand with one foot in front of the other and to balance in that way suggesting a fourth lesion in the area of the cerebellum.

It was Dr. Klawans' impression at that time that plaintiff had multiple sclerosis or its euphemism, demyelinating disease. Plaintiff was admitted to the hospital to carry out some studies to see if they could confirm the diagnosis and to initiate some therapy.

Dr. Klawans stated that the colloidal gold curve or Lange gold curve is a series of 10 separate tests to give you information of the quality of the proteins in the spinal fluid extracted by lumbar puncture. Normally, the results should all be zeros or a few ones. Plaintiff's gold curve reads, as indicated in the hospital discharge summary: three, two, two, two, one, zero, zero, zero, zero, zero. This is what is known as a first zone elevation of the gold curve, and it is frequently found in patients with multiple sclerosis and is considered to be confirmatory evidence of the clinical diagnosis.

She was placed on therapy with ACTH which is the most widely accepted form for her therapy for treatment. It tends to decrease areas of inflammation in the central nervous system and thereby improve function in those areas which are marginally functioning because of the inflammation.

She was given a course of ACTH therapy and showed significant and definite improvement and has continued to maintain this improvement. Her neurological symptoms are somewhat decreased, and her

neurological examination is improved. If the treatment for the disease helps make the patient better, it usually helps to confirm one's diagnosis.

Dr. Klawans stated that there is no cure for multiple sclerosis. Physical therapy can, of course, occasionally be of help depending upon what the disability of the patient is.

Her major problem is that fatigue and use of the muscles tends to bring out symptoms again. Although her disability at any one point in time, especially when she is well rested, is not so great, she is unable to carry on sustained effort. It is very common in patients with multiple sclerosis, that they must learn to carry out much more limited activity. Based on his examination and diagnosis of plaintiff, it is Dr. Klawan's opinion that she could not continue in her employment as a licensed practical nurse.

Dr. Klawans testified further that the possibility of her showing any significant improvement at this time is approximately nil; that she has had ACTH and clinical improvement for a period of several months prior to that time; that she may maintain this improvement for a period of time. He thought that the possibility for further improvement at this time was very remote.

He said the possibility of further disability in the future is, of course, very high. Patients who have attacks tend to have more attacks. He could not predict when or how severe these attacks will be, but could certainly state relatively categorically that the possibility of her having increasing further attacks of increased disability is extremely high.

When asked if he had an opinion, based upon a reasonable degree of medical certainty, as to whether the condition of multiple sclerosis might or could have been precipitated or aggravated by the trauma experienced in the accident of September 27, 1970, he stated, "I think that it could well be."

On cross-examination, when asked if the fall that plaintiff suffered in November 1970 could have precipitated multiple sclerosis, Dr. Klawans replied, "I would think this fall would be less likely than other falls in that it involved predominantly an injury to her right hand and wrist." In response to a question about the automobile accident and resultant whiplash injury of February 1973 he stated that it "could or might" precipitate multiple sclerosis. He noted that plaintiff complained of blurred vision in August of 1972, approximately one year before the automobile accident. Dr. Moore's records showed complaints of diplopia or blurred vision prior to the auto accident. He was aware that no other doctors diagnosed multiple sclerosis.

Dr. Klawans repeated on cross-examination that he found four lesions in his neurological examination of plaintiff: (1) her reflexes were active and not symmetrical; (2) there was decreased sensation over the right side of her face; (3) he found mild ataxia, that is, difficulty with walking due to

imbalance; and (4) nystagmus (difficulty with eye movements). He stated that he could not determine which occurred first from the above objective findings. He said that could only be determined from the patient's history. Dr. Klawans found urinary incontinence for periods of from one day to one week.

The general objective findings that relate to multiple sclerosis are evidence of patching involved in the nervous system, which means that more than one area of the nervous system dysfunctions.

He did not find plaintiff's complaints vague. He did not believe that the complaints which plaintiff made to him could possibly be the result of a psychological overlay. He stated that the patient would not necessarily have to be consistent in her complaints from the time he first examined her until she entered the hospital under his service.

If Dr. Gerald Schumaker, who is considered knowledgeable in multiple sclerosis (Clinical Neurology (2d ed.)), says interference with control of bladder and rectal function is common in multiple sclerosis, Dr. Klawans would not disagree. He agrees that "frequency, urgency, and slight incontinence are the earliest bladder symptoms with progressively greater tendency and marked incontinence developing later." Plaintiff exhibited a recent history of some urinary incontinence. Schumaker also says "involvement of the pyramidal tracts gives rise to weakness, spasticity, hyperflexia, and clonus." Dr. Klawans found no spasticity.

Dr. Wittelle and Dr. Moore did find spasticity. Dr. Klawans found hyperflexia. Dr. Klawans found no clonus, which is a manifestation of extreme hyperflexia in the legs. Dr. Klawans, Dr. Wittelle, Dr. Marshall and Dr. Moore found facial paresthesia. Dr. Moore and Dr. Klawans found parasthesia and weakness to right arm and right leg with occasional stiffness and muscle pain. The lack of normal cervical lordosis is an objective finding and is indicative of trauma sufficient to cause precipitation of multiple sclerosis. When a patient has a history of recurring falling or even a single episode of falling which is out of the ordinary, or has evidence of imbalance or ataxia on subsequent examination, it is suggested that the ataxia predated these symptoms and was one of the factors which led to falling.

Dr. Leo Frederick Miller saw the plaintiff at defendant's request on January 29, 1974, for about 25 minutes. This included inquiry; vascular, neurological and regional examinations; and discharge of the patient. He did not know how much of this time was spent in the routine neurological examination. He did not know or recognize plaintiff. He sees 40 to 50 people a day.

Dr. Miller graduated from the University of Illinois College of Medicine in 1929, served his internship at Mt. Sinai Hospital and his specialty is orthopedic surgery. He was formerly associated with the

University of Illinois as an associate, assistant attending orthopedic surgeon, assistant professor and is now full professor of surgery at the Chicago Medical School. He stated that he is not a competent neurologist but can recognize multiple sclerosis when he sees it and can recognize the underlying pathology of it.

He has never treated a multiple sclerosis patient or managed the care of a multiple sclerotic. Generally, multiple sclerosis is treated in three categories: (1) Neurologists, (2) orthopedic surgeons, and (3) physical therapists. He has treated multiple sclerosis as part of a team, seeing perhaps one or two patients in the last three years.

In his opinion trauma does not precipitate or exacerbate multiple sclerosis, but a physical injury to the neck region can exhibit an element of the disease. The etiology—cause—of multiple sclerosis is unknown. The witness appears to be suggesting in his opinion the generic term trauma is too broad.

External force may bring forth a symptom complex of multiple sclerosis. However, any form of emotional disturbance may cause multiple sclerosis. To the best of his recollection, the disease has no etiological (causation) factor, but has a degenerative factor resulting in a multiplicity of complaints due to allergy.

His objective findings were essentially: no masses or abnormalities about the soft tissue; no evidence of nystagmus; no unusual ocular motion; no spasticity in the neck; no swelling; no limitation of motion; gait was normal; muscle tone and power normal; and no vascular disturbance.

Xrays revealed heal of a fracture, but no other changes except for minimal changes noted in the spinal column, in the cervical column, and dorsal area.

He then concluded that if anything was present, it was temporary in character, and that her objective findings do not substantiate her subjective complaints.

He found no injury to any part. He said that loss of lordotic curve may have significance and may not. He examined plaintiff from an orthopedic standpoint and found her perfectly healthy and able to work eight hours a day without any problem at all.

Dr. Cascino is a physician and surgeon. He graduated from the University of Illinois College of Medicine in 1936 and interned at the University of Chicago. His specialty is neurosurgery. He belongs to several medical associations, particularly those whose members are surgeons or neurosurgeons. He is associated with St. Anne's Hospital as well as with other hospitals in the area. He is clinical professor of neurosurgery at the Stritch School of Medicine, Loyola University.

Neurosurgery is that portion of general medicine which deals with the diagnosis and treatment, more particularly the surgical treatment of

conditions that involve the nervous system, that is the brain, the spinal cord, and the nerves that emanate from these structures. He saw plaintiff on August 6, 1974, at defendant's request. He obtained a history from her and conducted an examination consisting of three parts; the tests, the subjective portion, and the objective portion. His examination of plaintiff took about half an hour.

The objective portion indicated that the patient was alert and oriented and had intelligible speech, except that on occasion he detected what he thought to be scanning or a deliberation to her speech. The deep tendon reflexes of the right arm were greater in response than the left side. He found no pathological findings and no Babinski. The eye movements were normal. He tested this by the patient placing her head erect and following his finger with her eyes. She performed cooperatively, accurately, and in a normal fashion. She had no nystagmus, which is a finding manifested by an involuntary twitching of the eyeballs usually when the eyeballs are made to look lateral to one side or to the other.

Plaintiff performed accurately and well in response to pin prick. In performing the finger to nose test there was a slight tremor. It was not a definite tremor, but a tendency for it to reveal itself. He had the patient place her feet together in an erect posture and close her eyes. This is called the Romberg sign and she performed it accurately, showing good stability and coordination. Her gait was normal. She had normal movement of her neck and lower back. He found no signs of muscle spasm; no limitation of movement; moons of the face and tongue were normal; no discharge from the ear canals.

Patient was neurologically negative except for a suspicious scanning speech that appeared once in a while. Second, she also had a suggestion of an intentional tremor which was not present all the time. Third, she had a greater reflex, deep tendon reflex action of her right arm as compared to her left arm but it also can be said that she had less of a response on the left side as compared to the right side.

Dr. Cascino then briefly discussed multiple sclerosis and its symptoms. He summarized by saying that nobody knows the cause of multiple sclerosis. Attacks can be precipitated by trauma, fatigue, exposure to cold, infections, emotional outbursts and worry. Before a definite diagnosis of multiple sclerosis is made, it is reasonable to say that they should have such findings as nystagmus, Babinski signs, reflex changes, vision difficulties. These signs would appear within weeks, months, maybe a couple of months after the trauma before you have exhausted the relationship of trauma to the appearance of the condition.

Trauma can precipitate the symptoms of multiple sclerosis. The care and treatment and diagnosis, with regard to the disease of multiple sclerosis come primarily within the field of neurology. There are two

specialties in neurology, the neurologist and neurosurgeon who does the surgery. The neurologist is responsible for the care, treatment, and diagnosis of multiple sclerosis. One of the most vexing problems of multiple sclerosis has to do with diagnosis. It is a disease that strikes in insidious ways. It takes a very trained observer making a very careful study to really be able to make a diagnosis of multiple sclerosis when it does not manifest itself in the classic form, when it is not in its most advanced stages.

In the emergency room the normal procedure would be to record the history, the subjective complaints and the objective findings with regard to those complaints, treat the most prevalent crisis needed to that part of the body that needs the care first.

If those complaints masked an underlying nerve problem, the doctor would only record those things that he was told, those things of which the patient complained. In the emergency room they do whatever is necessary.

In multiple sclerosis you usually find some motor nerve involvement. This refers to movement. Weakness is both an objective and subjective motor finding. Weakness such as not being able to hold a fork or to hold anything in her hand, weakness of the limb or right arm would be a motor finding such as the one he was talking about. And, if that sort of finding occurred within days or weeks of an injury to the neck, that would meet one of the requirements that he was talking about of trauma and precipitation of multiple sclerosis. That sort of complaint in conjunction with a doctor's diagnosis of radiculitis could go to substantiate motor nerve root involvement.

One of the other requirements was difficulty with speech. He stated that plaintiff exhibited "an area of suspicion with regard to speech." Deep tendon reflexes were found as being part of the motor nerve involvement. He found an imbalance in the reflexes on the right and left which is an abnormal finding.

There should be a loss of abdominal reflexes in multiple sclerosis but in this patient who had a loss of abdominal reflexes it might not be significant because the loss could have been due to childbirth.

He found no nystagmus which was another of his requirements. He tested for this by having the plaintiff follow his finger with her eyes. That is the only test he gave for nystagmus. It is the accepted standard of examining for nystagmus by someone in his specialty. Eye doctors perform certain tests for nystagmus that have to do with testing the eyes individually as opposed to testing them together.

The finding by Dr. Klawans stating "there was definite nystagmus," would refer to the eye and would be an objective finding under the physical examination by an examining doctor.

One of the real problems with multiple sclerosis is the fact that you have inflammation of the central nervous system where you have periods of exacerbation and remission. If they are in a period of remission, the symptomology might not be present or may be lessened.

The accepted treatment for multiple sclerosis includes muscle relaxants, high vitamin intake, tranquilization, drugs that open up blood vessels and ACTH steroid treatment.

From a subjective point of view a patient who had suffered a neck injury and then complains of weakness in a limb shortly thereafter would fall classically within the framework of the diagnosis or the beginning signs of multiple sclerosis.

The Lange curve is an objective test. The report shows a curve that is high at the beginning and comes down to zero. It can be an abnormal curve. That means it is of definite pathological value. "Without question it can be a means that it is possible for it to fit within the realm of abnormality. It can be that such a curve can be found in individuals who are presumably normal."

After having seen the objective findings of Dr. Klawans he would be in a better position to make a diagnosis as to whether or not this patient had multiple sclerosis or not.

It would be helpful when trying to make a diagnosis with regards to multiple sclerosis to have a patient in a controlled environment such as a hospital where you can perform the necessary tests.

■■■ Defendant's two points on appeal concern the alleged failure of the plaintiff to prove by a preponderance of the evidence that at the time of the action, she had multiple sclerosis and also her alleged failure to prove that there was a causal connection between the occurrence of September 27, 1970, on the elevated train and the disease. In arguing its first point, it abstracts Dr. Klawan's testimony and essentially notes that there was no finding of spasticity, clonus, loss of superficial abnormal reflexes, no history relating to the abdomen, atrophy, overactive jaw reflexes and weakness in lower facial muscles. Dr. Klawans stated that these were elements of multiple sclerosis. The record, however, is bereft of any testimony that findings of those elements are necessary to a diagnosis. Dr. Cascino, defendant's expert, had found significant objective symptoms. Dr. Cascino also noted that one of the real problems with multiple sclerosis is that there are periods of exacerbation and remission and that one of the most vexing problems is diagnosis. Dr. Klawans' opinion is based on an extensive examination in a controlled environment. He had the benefit of an overview of the entire case documented by plaintiff's other treating doctors over the years between the accident and his treatment. He was a treating doctor who treated his patient on his diagnosis of multiple sclerosis and saw her respond to the

classical treatment. Presented to the court was a question of fact. Its finding is based on allowable inferences and not on speculations. (*Walling v. Lingelbach* (1976), 65 Ill. 2d 244, 248, 357 N.E.2d 530.) The preponderance of expert medical evidence is determined, not by mere relative numbers of expert witnesses or the relative quantity of the expert testimony, but rather by the relative qualifications of the expert witness and the relative quality of the expert testimony and by the relative credibility of the expert witness. Its finding should not be disturbed.

In urging that there is no causal connection defendant notes the four separate occurrences, other than the occurrence of September 27, 1970, that gives rise to this action, and the opinion of Dr. Klawans in this matter, and characterizes that opinion as being conjectural at best.

Defendant only specifically comments on two of the other occurrences. It points out that Dr. Klawans testified that the fall suffered by the plaintiff in November 1970 may have precipitated multiple sclerosis. The doctor also testified, however, that, "I would think this fall would be less likely than other falls in [precipitating multiple sclerosis] in that it involved predominantly an injury to her hand and wrist." When the witness was asked if that fall with an extended arm would in some way react on the neck and shoulder, the doctor answered that, "there were no symptoms suggestive of significant involvement of the neck at that time." Finally, when asked if that fall might have precipitated multiple sclerosis he answered, "possibly, with a low order of probability."

Defendant observes that Dr. Klawans testified that the accident of 1973 could have been a precipitant cause of the latent multiple sclerosis. This occurrence was over two years after the CTA accident and during these two years plaintiff had significant complaints.

Defendant further notes that Dr. Klawans testified that his findings relating to the precipitation of multiple sclerosis would be based on the accuracy of the history that plaintiff gave to him. The diagnosis of Dr. Klawans is based only partially on the history given by the plaintiff. The trial court had the opportunity to observe the plaintiff to determine her credibility. If it doubted her, it was its function to discount the diagnosis made by the doctor. It chose not to do so and we cannot say that it was made in error. Further, Dr. Klawans' diagnosis was also based on hospital and medical records which made up a substantial part of the history.

Defendant asserts that because plaintiff gave no history of attacks prior to the date of the occurrence, Dr. Klawans' diagnosis must be discredited. We draw an opposite conclusion. A history of attacks prior to 1970 would tend to indicate that the occurrence in question was not the precipitating factor in the plaintiff's illness.

■■ The defendant concludes that the testimony does not establish the fact of causality by a preponderance of the evidence. The evidence was

conflicting and the trial court had the opportunity to observe the witnesses. It was his function to resolve the conflict. There was sufficient evidence in the record to warrant the court's finding and the judgment in favor of the plaintiff against the defendant.

■■ Defendant raises two other points. The order of the trial court recites the fact that only Dr. Klawans performed an adequate, extensive and thorough neurological examination. That finding is supported by the record. Defendant asserts that the plaintiff's testimony lacks credibility because of alleged contradictions. This again is for the trier of fact to resolve.

Judgment of the trial court is affirmed.

Affirmed.

HAYES, J., concurs.

Mr. PRESIDING JUSTICE DOWNING, dissenting:

My problem with this case involves the answers to two questions: first, did the plaintiff establish that the condition complained of was the result of the "el" accident of September 27, 1970; and second, were the other accidents or incidents in which plaintiff was involved properly eliminated as possible causes of the condition complained of. I think the answer is "no" to both questions. Therefore, in my opinion, plaintiff did not sustain her burden of proof. For that reason I would reverse.

As has been meticulously detailed in the majority opinion, nine doctors testified in the trial, and the findings of an additional two were brought out during the course of the testimony. Five of the doctors testified for the plaintiff, while four testified for the defendant. Only plaintiff's witness, Dr. Klawans, diagnosed her condition as multiple sclerosis (hereinafter M.S.). Yet, interestingly enough, Dr. Klawans acknowledged that his interns who took the plaintiff's case history did not agree with his objective findings.

The trial court stated that it was persuaded by the clear and convincing testimony of plaintiff's witness, Dr. Klawans. At the outset it is recognized that where there is conflicting testimony and the trier of fact had the opportunity to observe the witnesses as they testified, and to determine the credibility of the witnesses and the weight to give to their testimony, a reviewing court will not reverse unless the finding is manifestly against the weight of the evidence. See *Spankroy v. Alesky* (1st Dist. 1977), 45 Ill. App. 3d 432, 359 N.E.2d 1078.

However, this court has also held "the weight of an expert's opinion must be measured by the reasons given for the conclusion and the factual details marshalled in support thereof." *St. Paul Fire & Marine Insurance*

*Co. v. Michelin Tire Corp.* (1st Dist. 1973), 12 Ill. App. 3d 165, 179, 298 N.E.2d 289; *Mullen v. General Motors Corp.* (1st Dist. 1975), 32 Ill. App. 3d 122, 131, 336 N.E.2d 338.

Expert witnesses testifying about cause and effect in medical cases are permitted rather broad latitude in expressing an opinion as to an ultimate issue in a case. However, as a safeguard upon the reliability of such testimony, the expert witness, no matter how skilled or experienced, will not be permitted to guess or state a judgment based on mere conjecture. *Boose v. Digate* (3rd Dist. 1969), 107 Ill. App. 2d 418, 422, 246 N.E.2d 50.

The plaintiff was injured in an "el" train accident on September 27, 1970. The record indicated that the plaintiff was also involved in the following accidents and incidents:

(1) in 1965, she received a whiplash injury;

(2) June 1970, she received a bruised left side in a car accident;

(3) November 1970, she sustained a broken arm as the result of a fall in her home; and

(4) February 1973, she received a whiplash in a car accident.

Thus plaintiff had the burden of establishing that the condition complained of was the result of the September 27, 1970, "el" accident, and as stated by the trial court, that burden required clear and convincing evidence.

In *Dixon v. Industrial Com.* (1975), 60 Ill. 2d 126, 131, 324 N.E.2d 393, our supreme court repeated what it had said earlier: "We would note parenthetically that we have recognized that where medical knowledge of a disease is limited, as is so in the case of multiple sclerosis, medical evidence as to causation may not be unqualified and unequivocal. (*National Castings Division of Midland-Ross Corp. v. Industrial Com.* 55 Ill. 2d 198.)"

Commencing with the testimony of the doctor who first examined the plaintiff following the September 27, 1970, "el" accident until February 6, 1974, there is no evidence in the record that any examining or treating physician diagnosed plaintiff's problem as M.S. Then in February 1974, in connection with this lawsuit filed in October 1970, Dr. Klawans examined plaintiff. It is important to remember that at the time of initially seeing plaintiff, Dr. Klawans had been furnished a typed history of the plaintiff prior to the February 1974 visit; however, the author of that document was not identified. Thus, relying on this prepared history and aided by the records and reports of other hospitals and examining physicians, Dr. Klawans gave plaintiff a neurological examination. She was then admitted to a hospital for tests in connection with his diagnosis of M.S.

The issue of whether plaintiff had M.S. is clearly disputed. Not one doctor who examined her, other than Dr. Klawans, diagnosed her problem as M.S. It is recognized that Dr. Klawans is an expert, but so was

Dr. Cascino, the neurosurgeon retained by the defendant who examined plaintiff in August 1974, who found no M.S.

Thus the trial court was confronted with the testimony of four examining or treating physicians who examined plaintiff between September 27, 1970 through 1973, and none of them noted any sign of M.S. On the other hand, the court was confronted with the testimony of Dr. Klawans. My reading of all of that testimony leads me to the conclusion that because of the nature of the evidence—the dates and circumstances of the examinations—plaintiff failed to establish that she was suffering from M.S.

But assuming, arguendo, that plaintiff did establish she had M.S., the next question is, does the record establish a causal relationship between the accident of September 27, 1970 and M.S.? My answer is no. I think the conclusion of the trial court is clearly against the manifest weight of the evidence.

At the outset it is to be noted that Dr. Klawans testified that his findings relating to the precipitation of M.S. would be based on the accuracy of the history plaintiff provided. That is the typed statement whose authorship is unknown. It is to be noted that the record indicated contradictions between plaintiff's testimony and other evidence. For example, (i) the question of plaintiff's ability to talk at the hospital following the "el" accident; (ii) whether the incident in November 1970 was caused by tripping on a rug or her leg giving out; (iii) the question of whether she reported to the hospital a condition of dizziness, loss of balance, or double vision; and (iv) the question of comparing her characterization to the doctors of her condition of health, such as the condition of her neck or right side of her face and the numbness of her fingers or hand. Strangely enough, only to Dr. Klawans—in the typed history—were all the classical symptoms of M.S. disclosed. Thus, in my opinion, the accuracy of plaintiff's history given to Dr. Klawans is against the manifest weight of the evidence. And, as Dr. Klawans admitted, his conclusions "would be based on the accuracy of the history that she gave me."

Even accepting the verity of the history, it is necessary to examine the record to determine the causal relationship between the September 27, 1970, accident and M.S. If there is a causal connection, Dr. Klawans provided it.

As for the September 27, 1970, accident, his testimony in response to a question "based upon a reasonable degree of medical certainty as to whether the condition of multiple sclerosis might or could have been precipitated or aggravated by the trauma experienced in the accident" was "I think that it could well be." Whether it was "precipitated" or "aggravated" was never clarified.

It is revealing that Dr. Klawans also testified that plaintiff's fall suffered in November 1970, and the accident of February 1973, may have precipitated M.S.

In my opinion the plaintiff had the burden under the facts in this case to prove not only that the "el" accident could have caused the condition complained of, but that it probably did. *Cf. Cohenour v. Smart* (1951), 205 Okla. 668, 240 P.2d 91, 93; 31 Am. Jur. 2d *Expert & Opinion Evidence* §185 (1967).

Dr. Klawans did not eliminate the four other accidents or incidents as possible causes of the condition complained of. In fact he testified that two other incidents or accidents could have precipitated the M.S. How then can one say the September 27, 1970, incident was the cause of plaintiff's problem? Dr. Klawans' conclusion is too conjectural and should be rejected. (See *Boose v. Digate.*) In my opinion, the judgment of the trial court is clearly against the manifest weight of the evidence.